ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

v.

FLASHDOT LIMITED,
    f/k/a "Phoenixfin Limited,"

PEKEN GLOBAL LIMITED, and

PHOENIXFIN PRIVATE LIMITED, together
with Flashdot Limited and Peken Global
Limited, d/b/a KuCoin,

CHUN GAN, a/k/a "Michael," and

KE TANG, a/k/a "Eric,"

              Defendants.

---

**SEALED INDICTMENT**

24 Cr.

## 24 CRIM 168

---

**COUNT ONE**
**(Conspiracy to Violate the Bank Secrecy Act)**

The Grand Jury charges:

**OVERVIEW**

1.    At all times relevant to this Indictment, FLASHDOT LIMITED (a business entity incorporated in the Cayman Islands), formerly known as Phoenixfin Limited, PEKEN GLOBAL LIMITED (a business entity incorporated in the Republic of Seychelles), and PHOENIXFIN PRIVATE LIMITED (a business entity incorporated in Singapore) (together, "KuCoin"), and two of KuCoin's founders and majority owners, CHUN GAN, a/k/a "Michael," and KE TANG, a/k/a "Eric," the defendants, have operated an online cryptocurrency exchange and trading platform through the website www.kucoin.com and an application available for download on mobile phones.

2.     Since its founding in or about September 2017 by, among others, CHUN GAN, a/k/a "Michael," and KE TANG, a/k/a "Eric," the defendants, KuCoin has become one of the largest global cryptocurrency exchange platforms.  As of in or about March 2024, according to its public website, KuCoin had over 30 million customers located in at least 207 countries and territories, and, according to a third-party public website, its daily spot trading volume exceeded $2.8 billion.  KuCoin's website also touts public rankings of cryptocurrency exchanges that place KuCoin in the top five worldwide.  As of December 2023, one of these public rankings listed KuCoin as the fifth largest cryptocurrency spot exchange based on traffic, liquidity, and trading volumes, among other factors, and the fourth largest cryptocurrency derivatives exchange based on liquidity and normalized volume, among other factors.

3.     KuCoin solicits and accepts orders for spot trades in cryptocurrencies, including Bitcoin, Ethereum, and others.  KuCoin customers are required to deposit cryptocurrency in a KuCoin account prior to engaging in any trading activity, including spot trading.

4.     KuCoin also solicits and accepts orders for trades in, among other things, futures contracts and other derivative products tied to the value of cryptocurrencies, including Bitcoin. KuCoin accepts cryptocurrencies, including Bitcoin, from its customers to margin and guarantee derivative products and, as of at least in or about October 2019, offered its customers up to 100 times leverage.

5.     Since its launch in September 2017 through the present, KuCoin, CHUN GAN, a/k/a "Michael," and KE TANG, a/k/a "Eric," the defendants, have actively sought to serve, and have in fact served, thousands of customers located in the United States, and through in or about December 2023, actively sought to serve and in fact served customers located in the Southern District of New York.

6.     By engaging in the foregoing actions, among other things, KuCoin has at all relevant times been a money transmitting business required to register with the U.S. Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN") and, since in or about July 2019, when it launched a derivatives trading platform, has been a futures commission merchant ("FCM"). As such, KuCoin is required to comply with the provisions of the Bank Secrecy Act, 31 U.S.C. § 5311 *et seq.* (the "BSA"), applicable to money transmitting businesses and FCMs.

7.     From at least in or about September 2017 through the present, however, KuCoin, CHUN GAN, a/k/a "Michael," and KE TANG, a/k/a "Eric," the defendants,  willfully failed to establish, implement, and maintain an adequate and effective anti-money laundering ("AML") program, including an adequate customer verification program, more commonly referred to as a know-your-customer ("KYC") program, in violation of the BSA.  From at least in or about September 2017 through at least in or about December 2023, KuCoin also failed to register with FinCEN as a money transmitting business.

8.     As part of this willful evasion of KuCoin's obligations to comply with U.S. AML and KYC requirements, KuCoin, CHUN GAN, a/k/a "Michael," and KE TANG, a/k/a "Eric," the defendants, affirmatively attempted to, and did, conceal the existence of KuCoin's large base of U.S. customers in order to make it appear as if KuCoin was exempt from U.S. AML and KYC requirements.  Indeed, KuCoin actively prevented its U.S. customers from even identifying themselves as such to KuCoin when establishing KuCoin accounts.  Moreover, KuCoin lied to at least one investor regarding the geographic location of its customers, falsely representing that it had no U.S. customers, when, in truth and in fact, KuCoin and its executives, including GAN and TANG, knew that KuCoin's customer base included a substantial portion of customers based in the United States.

3

9.     In part as a result of the willful failure of KuCoin, CHUN GAN, a/k/a "Michael,"
and KE TANG, a/k/a "Eric," the defendants, to implement AML and KYC programs, KuCoin
made itself available to be used, and in fact was used, as a vehicle for laundering the proceeds of
suspicious and criminal activities, including proceeds from sanctions violations, darknet markets,
and malware, ransomware, and fraud schemes.  Specifically, since its founding, KuCoin has
received over $5.39 billion and transmitted over $4.09 billion of such suspicious and criminal
proceeds.

10.     Many KuCoin customers used its trading platform specifically because of the
anonymity of the services it provided.  In other words, KuCoin's no-KYC policy was integral to
its growth and success between in or about 2017 and in or about July 2023.

## Background on the Bank Secrecy Act

11.     The Bank Secrecy Act, as amended by the Patriot Act of 2001, is designed to
"prevent the laundering of money and the financing of terrorism" and "protect the financial system
of the United States from criminal abuse."  31 U.S.C. § 5311.  The BSA imposes reporting,
recordkeeping, and controls requirements on covered "financial institutions," which include FCMs
that are required to register as such under the Commodity Exchange Act (the "CEA"), and money
transmitting businesses "who engage[] as a business in the transmission of currency, funds, or
value that substitutes for currency" and are required to register as such with FinCEN.  31 U.S.C.
§ 5312.

12.     The CEA requires an entity to register as an FCM with the United States
Commodity and Futures Trading Commission (the "CFTC") if it solicits or accepts orders for
commodity futures contracts, swaps, or retail commodity transactions (among other specified
products), and in or in connection with such activity accepts any money or property to margin,
guarantee, or secure any trades or contracts that result or may result therefrom.  Bitcoin and other

4

cryptocurrencies are "commodities" under the CEA.

13.     Under the BSA, an FCM must establish an AML program that is approved by senior management and that includes, at a minimum: "policies, procedures, and internal controls reasonably designed to prevent the financial institution from being used for money laundering or the financing of terrorist activities"; independent compliance testing; ongoing training for appropriate personnel; and "risk-based procedures for conducting ongoing customer due diligence." *See* 31 U.S.C. § 5318(h)(1); 31 C.F.R. § 1026.210.  FCMs must also file suspicious activity reports ("SARs") in certain situations, including when a transaction involves funds or other assets of at least $5,000 and the FCM knows, suspects, or has reason to suspect that the transaction involves funds derived from illegal activity or that the FCM is being used to facilitate criminal activity. *See* 31 C.F.R. § 1026.320.

14.     As part of its AML program, an FCM must implement a written KYC program that includes "risk-based procedures for verifying the identity of each customer to the extent reasonable and practicable."  This KYC program must enable an FCM to "form a reasonable belief that it knows the true identity of each customer."  At a minimum, an FCM must collect the name, date of birth, address, and government identification number of each customer prior to account opening, and must take steps to verify that information in a reasonable time. The KYC program must also include procedures for "determining whether a customer appears on any list of known or suspected terrorists or terrorist organizations issued by any Federal government agency." *See* 31 U.S.C. § 5318(l); 31 C.F.R. § 1026.220.

15.     The BSA also requires money transmitting businesses to register with the U.S. Secretary of the Treasury. *See* 31 U.S.C. § 5330.  Cryptocurrency exchanges that accept and transmit cryptocurrencies are money transmitting businesses.    Under the BSA and its

5

implementing regulations, money transmitting businesses must "develop, implement, and maintain

an effective anti-money laundering program," *i.e.*, "one that is reasonably designed to prevent the

money services business from being used to facilitate money laundering and the financing of

terrorist activities." 31 C.F.R. § 1022.210. At a minimum, an effective AML program must

include customer identification procedures, a compliance officer, training and education of

appropriate personnel in the AML program, and provide for independent review to monitor and

maintain an adequate program. *See id.* Money transmitting businesses must also identify and

report suspicious transactions relevant to a possible violation of law or regulations with the

Department of the Treasury. *See* 31 C.F.R. § 1022.320.

## Background on KuCoin, GAN, and TANG

16.    KuCoin has, at all times relevant to this Indictment, been owned and operated by

and through one or more associated companies, including FLASHDOT LIMITED, formerly

known as Phoenixfin Limited, PEKEN GLOBAL LIMITED, and PHOENIXFIN PRIVATE

LIMITED, the defendants. KuCoin has never had a physical presence in either the Seychelles or

the Cayman Islands, where the defendants are incorporated. Rather, KuCoin's employees and

physical operations are located in Singapore and China, among other places.

17.    KuCoin was founded in or about September 2017 by CHUN GAN, a/k/a "Michael,"

and KE TANG, a/k/a "Eric," the defendants, and others. GAN and TANG have been co-owners

of KuCoin since its founding. As of in or about March 2022, GAN and TANG have been Directors

of and together held an approximately 75% ownership share in KuCoin's holding company

FLASHDOT LIMITED, formerly known as Phoenixfin Limited, the defendant. PEKEN

GLOBAL LIMITED and PHOENIXFIN PRIVATE LIMITED, the defendants, are subsidiaries

and/or affiliates of FLASHDOT LIMITED.

6

18.     PEKEN GLOBAL LIMITED, the defendant, has operated KuCoin since in or about September 2019 through the present. CHUN GAN, a/k/a "Michael," and KE TANG, a/k/a "Eric," the defendants, control PEKEN GLOBAL LIMITED; GAN is its Director and GAN and TANG are its sole shareholders.

19.     PHOENIXFIN PRIVATE LIMITED, the defendant, is the entity that operated KuCoin from in or about September 2017 through in or about December 2018. As of in or about May 2018, CHUN GAN, a/k/a "Michael," the defendant, was the Chief Executive Officer ("CEO") of PHOENIXFIN PRIVATE LIMITED and KE TANG, a/k/a "Eric," the defendant, was its President.

20.     From in or about September 2017 through the present, KuCoin has offered and allowed its customers to engage in spot trades of cryptocurrencies, including Bitcoin. As of October 2023, KuCoin allowed its customers to buy and sell more than 700 cryptocurrencies. According to KuCoin's public website as of October 2023, KuCoin had daily spot trading volume of approximately $10 billion, allowed the purchase of cryptocurrencies with more than fifty fiat currencies, and offered customers margin spot trading at up to ten times leverage.

21.     In or about July 2019, KuCoin launched a derivatives trading platform that allowed its customers to trade futures contracts based on cryptocurrencies, including Bitcoin. KuCoin's first futures product offering was a "Bitcoin Perpetual Contract," the value of which was derived by reference to the Bitcoin/U.S. dollar exchange rate as published on six third-party cryptocurrency exchanges. At that time, KuCoin offered its customers up to 20 times leverage.

22.     At various times since July 2019, KuCoin has expanded its futures product offerings. By October 2019, KuCoin offered its customers up to 100 times leverage on futures trades, and by August 2021, KuCoin offered futures contracts involving over 60 different

cryptocurrencies.

23.     Since in or about November 2021, KuCoin has permitted customers to use fiat currency, including U.S. dollars, in addition to cryptocurrency to make deposits into their KuCoin accounts. Before then, KuCoin customers who wanted to use fiat currency in connection with deposits could do so, but only through third-party fiat gateways.

**KuCoin Deliberately Failed to Implement BSA-Compliant AML and KYC Programs**

*KuCoin Has Deliberately Sought and Obtained Substantial Numbers of U.S. Customers*

24.     At all times relevant to this Indictment, KuCoin has solicited and accepted offers on its spot trading and derivatives trading platforms from customers located in the United States, including individual retail customers. As of in or about May 2018, for example, KuCoin, in materials sent to a potential investor ("Investor-1") via email on which two of KuCoin's founders and majority owners, CHUN GAN, a/k/a "Michael," and KE TANG, a/k/a "Eric," the defendants, were copied, represented that it had more than double the customers in the United States—approximately 17% of its customer base—than it had in any other country in the world. The next largest country had approximately 6.8% of KuCoin's customer base. Consistent with this representation, as of in or about November 2022, a third-party analysis of digital traffic showed that approximately 19% of visits to KuCoin's website, www.kucoin.com, were from individuals in the United States.

25.     KuCoin also engaged in marketing activities with the intent and effect of attracting U.S. customers. For example, KuCoin employees regularly attended cryptocurrency conferences in the Southern District of New York and elsewhere in the United States. In or about June 2022, KuCoin was a sponsor of NFT.NYC 2022, a conference regarding non-fungible tokens ("NFTs") held in Manhattan. Also in or about June 2022, a KuCoin senior executive and other KuCoin

8

employees attended Consensus 2022, a cryptocurrency conference held in Austin, Texas at which KuCoin hosted an informational booth.

26.     KuCoin and its founders, CHUN GAN, a/k/a "Michael," and KE TANG, a/k/a "Eric," the defendants, were well aware that substantial numbers of U.S.-based persons were using KuCoin. At all times relevant to this Indictment, KuCoin collected customers' location information, including internet protocol ("IP") address information, from customers' electronic devices, which indicated the location from which the device accessed KuCoin's platform. The IP address information collected by KuCoin demonstrated that KuCoin customers were accessing KuCoin using U.S.-based IP addresses. Moreover, KuCoin maintained login history for its customers, which included associated location information under the heading "Login Region." For example, an email sent from KuCoin to a U.S. customer on or about November 14, 2022 notified the customer that he had logged in from "United States Bridgehampton." In addition, KuCoin included customer IP address information, including U.S.-based IP addresses, in emails sent to KuCoin customers for verification purposes in connection with customer withdrawals.

27.     This location information collected by KuCoin included U.S. locations for customers in the United States. KuCoin also included location information in certain automated emails it sent to customers. CHUN GAN, a/k/a "Michael," and KE TANG, a/k/a "Eric," the defendants, knew that such automated emails reflected that KuCoin users were logging into KuCoin from the United States. Indeed, in certain instances GAN and TANG received such emails from KuCoin reflecting that they themselves had logged into their KuCoin accounts from locations in the United States. For example, in or about January 2021, TANG received an email from no-reply@kucoin.com confirming that, according to his IP address, TANG had personally logged into KuCoin from Los Angeles, California. Likewise, in or about January 2019, GAN received an

9

automated email from no-reply@kucoin.com confirming that, according to his IP address, GAN had personally logged in to KuCoin from San Mateo, California.

*Although KuCoin Had Substantial Numbers of U.S. Users, the Defendants Deliberately Failed to Register with the CFTC and FinCEN*

28.     Because KuCoin operates a derivatives exchange that offers and sells commodity futures to retail and non-retail customers in the United States, and in connection with such offers and sales accepts property to margin, guarantee, and secure those trades and contracts, it is required to register with the CFTC as an FCM. Nevertheless, KuCoin and CHUN GAN, a/k/a "Michael," and KE TANG, a/k/a "Eric," the defendants, failed to register KuCoin with the CFTC as an FCM.

29.     In addition, because KuCoin accepts and transmits cryptocurrencies to retail and non-retail customers in the United States, it is required to register with FinCEN as a money transmitting business. Nevertheless, from at least in or about September 2017 through at least in or about December 2023, KuCoin and CHUN GAN, a/k/a "Michael," and KE TANG, a/k/a "Eric," the defendants, failed to register KuCoin with FinCEN as a money transmitting business.

*The Defendants Willfully Failed to Implement BSA-Compliant AML and KYC Programs*

30.     KuCoin, CHUN GAN, a/k/a "Michael," and KE TANG, a/k/a "Eric," the defendants, willfully solicited and accepted customers in the United States without complying with U.S. AML and KYC requirements.

31.     By at least in or about September 2017, KuCoin, CHUN GAN, a/k/a "Michael," and KE TANG, a/k/a "Eric," the defendants, understood that U.S. AML and KYC requirements would in fact apply to KuCoin if it served U.S. customers or otherwise operated within the United States. As KuCoin's CEO publicly acknowledged in or about October 2021 on Reddit, an American social news aggregation, content rating, and discussion website, KuCoin "keep[s] a close eye on the regulation changes in every market we operate."

10

32.     In or about May 2018, when a sales representative from a financial services company asked one of KuCoin's founders and majority owners, CHUN GAN, a/k/a "Michael," the defendant, to "provide your FinCEN registration as a money transmitter given your company services US citizens," GAN confirmed his knowledge of the FinCEN registration requirements when he responded, "[w]e haven't [sic] a FinCEN registration yet." As noted *supra*, paragraph 29, from at least in or about September 2017 through at least in or about December 2023, KuCoin in fact did not register with FinCEN as a money transmitting business.

33.     KuCoin, CHUN GAN, a/k/a "Michael," and KE TANG, a/k/a "Eric," the defendants willfully flouted U.S. AML and KYC legal obligations and sought to conceal KuCoin's conduct from third parties. Among other things, KuCoin, GAN, and TANG allowed customers, including individual retail customers in the United States, to register and trade without providing sufficient identifying information or documents to allow KuCoin to form a reasonable belief that it knew the true identity of its customers. Prior to on or about July 15, 2023, customers could register to trade on KuCoin anonymously, by providing only an email address and without providing any identifying information or documentation. For example, in or about March 2023, a new KuCoin customer was able to obtain a new account and subsequently engage in spot and futures trades by providing only an anonymous email address.

34.     Indeed, KuCoin employees regularly and frequently stated on public social media sites that KYC was not mandatory on KuCoin, including in response to posts from customers who had identified themselves as being in the United States.



**KuCoin Moderator**
@KuCoinModerator

⋯

Replying to @kevgrif66

**Hi! KYC is not supported to USA users, however, it is not mandatory on KuCoin to do KYC. Usual transactions can be done using an unverified account -** support.kucoin.plus/hc/en-us/artic...

11:37 PM · Apr 21, 2022

35.     As a result, from at least in or about November 2022 through at least in or about March 2023, KuCoin customers who were located in the United States opened multiple KuCoin accounts and conducted spot and futures trades, including margin trades, all without providing any personal identifying information or identity documents.

36.     On or about June 17, 2022, a KuCoin U.S. customer (the "U.S. Customer") wrote to support@kucoin.com, which account's distribution list included two of KuCoin's founders and majority owners, CHUN GAN, a/k/a "Michael," and KE TANG, a/k/a "Eric," the defendants, as well as KuCoin's CEO, that the U.S. Customer was "a regulatory attorney" and had "found numerous regulatory issues at KuCoin (including AML, KYC, Unregistered Platform, Material Misstatements)." The U.S. Customer asked for assistance resolving an issue regarding a liquidated position and stated that "if KuCoin is unwilling to refund my account, I will have no choice but to reach out to my regulatory contacts with my findings . . . ." The next day, after a series of communications with the U.S. Customer, support@kucoin.com responded to the U.S. Customer that "the platform found that your account IP address is from a restricted country" and asked the U.S. Customer to submit information from a non-restricted country for KYC or KuCoin would "according to our compliance policy, . . . have to terminate the account service with you." In response, the U.S. Customer sent KuCoin, among other things, multiple screenshots of public

12

KuCoin social media posts confirming that U.S. customers could use KuCoin.

37.     KuCoin froze the U.S. Customer's account that same month. However, the U.S. Customer thereafter was simply able to open another KuCoin account from the United States from a computer associated with a U.S. IP address, showing that the U.S. Customer's account was frozen not because the U.S. Customer was a U.S. user, but because of the U.S. Customer's threat of legal action. As noted in the U.S. Customer's responses to KuCoin and as shown by the ease with which the U.S. Customer thereafter opened another KuCoin account from the United States from a computer associated with a U.S. IP address, KuCoin did *not* have a general practice of restricting use by U.S. customers; in fact, KuCoin's social media posts and its significant number of confirmed U.S. customers prove the opposite.

38.     Because KuCoin at no relevant time had an adequate KYC program, KuCoin could not and did not monitor its customer transactions for money laundering, terrorist financing, and sanctions violations. Accordingly, although KuCoin has received over $5.39 billion and sent over $4.09 billion of suspicious and criminal proceeds since its launch in or about September 2017, KuCoin has never filed any Suspicious Activity Reports to report known or suspected violations of law and suspicious activity to FinCEN.

39.     While KuCoin actively solicited U.S. customers and allowed them to use its platform without requiring any KYC or providing any AML controls, KuCoin took affirmative steps to make it appear as if KuCoin was exempt from the application of U.S. AML and KYC requirements and to conceal the existence of its U.S. customer base.

40.     For example, KuCoin offered customers an optional identity verification process that, once completed, granted customers access to additional features such as the ability to make larger daily withdrawals. Despite knowing that many of its customers were located in the United

13

States, KuCoin did not include the United States as a possible country for selection by customers in this optional verification process. By excluding the United States from a lengthy list of countries in the drop-down menu provided to customers utilizing this process, KuCoin prevented U.S. customers from being able to identify themselves as such.

41.     Despite preventing customers from identifying themselves as U.S.-based, KuCoin actively encouraged U.S. customers to utilize its spot trading and derivatives trading platforms. For example, in or about April 2022, a user of the "X" social media platform (formerly known as "Twitter") wrote that he was "in the United States" and that his attempt to use KuCoin's optional verification process had failed. In response, a KuCoin representative wrote that while "users from the USA is not supported for KYC service," "[r]est assured that you are not obliged to do KYC on KuCoin."

42.     Similarly, in or about February 2022, a Reddit user asked "Will Kucoin ever follow U.S. KYC/AML requirements?" In response, a KuCoin representative stated that "we are only providing service for countries listed in the KYC countries list (US is not included), in order to comply with all applicable laws and regulations," but further explained that "you may still perform all functions on our exchange as normal" except that "[t]here will be individual account's daily withdrawal limitation of 5 BTC [Bitcoin]" and potential limitations on other activities.

43.     As described above, in or about May 2018, KuCoin told Investor-1 that approximately 17% of its customers were based in the United States, *see supra* paragraph 24. But over time KuCoin concealed its reliance on its U.S. customer base from third parties, including investors. In or about January 2022, for example, KuCoin provided a potential investor ("Investor-2") with financial and operational data for 2020 and 2021 in which it falsely represented that it had no U.S. customers. Instead, KuCoin claimed that its largest market, with approximately 18.4% of

14

its customers, was "South America." Based in part on those representations, in or about May 2022, Investor-2 invested approximately $8 million in KuCoin. KuCoin's representation to Investor-2 that it had no U.S. customers was false. As noted *infra* paragraph 47, over a year and a half later, on or about December 8, 2023, KuCoin, through its current operating entity PEKEN GLOBAL LIMITED, the defendant, entered into a publicly filed consent order with the Attorney General of the State of New York, admitting that, as of November 29, 2023, KuCoin held approximately $16,766,642 in assets for New York customers.

44.     It was only on or about May 15, 2023, that KuCoin belatedly adopted a KYC program requiring verification of identities, after Investor-1 and a financial services company notified KuCoin of a federal criminal investigation into its activities. And even then, KuCoin's KYC program was not BSA-compliant. On or about May 15, 2023, KuCoin revised the "Terms of Use" that are posted on its public website. KuCoin's prior Terms of Use, which were last revised in or about August 2019, included a purported undertaking that "the User . . . is not a resident of or registered in, any of the jurisdictions that [KuCoin] has deemed to be high risk." These Terms of Use, however, did not actually identify any "high risk" jurisdictions. On or about May 15, 2023, this provision was replaced with one setting forth a purported undertaking that "the User . . . is not a resident of or registered in any of the Restricted Locations," and "Restricted Locations" was defined to include the United States. While KuCoin publicly trumpeted Terms of Use purportedly excluding U.S. users from its service, in truth and in fact, a substantial number of U.S. users continued to use the platform, as KuCoin well knew. For example, as noted *infra*, paragraph 47, nearly seven months later, on or about December 8, 2023, KuCoin, through its current operating entity PEKEN GLOBAL LIMITED, the defendant, entered into a publicly filed consent order with the Attorney General of the State of New York, admitting that, as of November

29, 2023, KuCoin held approximately $16,766,642 in assets for New York customers.

45.    Approximately a month and a half later, on or about June 28, 2023, KuCoin announced that, as of July 15, 2023, it was introducing a mandatory KYC process.  However, this KYC process applied to new customers only and did not apply to KuCoin's millions of existing customers, including the substantial number of customers based in the United States.  According to KuCoin's announcement, existing customers would be allowed to continue using KuCoin's spot trading, futures trading, and margin trading features to withdraw, sell, and close positions without participating in the mandatory KYC process, but would not be allowed to deposit new funds.

46.    In or about September 2023, KuCoin purported to "block" U.S. customers from using its website, but it did not in fact do so.  Specifically, when a customer with a U.S. IP address visited the homepage of KuCoin's website, www.kucoin.com, a pop-up banner was displayed notifying the customer that "[b]ased on your IP address, we currently do not provide services in your country or region due to local laws, regulations, or policies."  This notification, however, was a mere façade.  KuCoin did not prevent customers in the United States, and using U.S. IP addresses, from logging in to their KuCoin accounts.  Moreover, if a customer with a U.S. IP address visited pages on KuCoin's website *other* than the primary homepage—such as, for example, the account "Sign Up" or account "Log In" pages—no similar banner or warning was displayed.

47.    On or about December 8, 2023, KuCoin, through its current operating entity PEKEN GLOBAL LIMITED, the defendant, entered into a publicly filed consent order with the Attorney General of the State of New York.  In that consent order, KuCoin acknowledged that it was acting as an unregistered securities broker or dealer in New York State and that, as of November 29, 2023, KuCoin held approximately $16,766,642 in assets for New York customers. New York customers were identified based on a New York address, phone number, or IP address

or GPS location in KuCoin's records.  As part of its consent order, KuCoin agreed to terminate access to its services for New York users within 120 days.

48.    As a result of its failure to implement BSA-compliant AML and KYC programs, KuCoin made itself available as a vehicle for money laundering.  For example, from at least in or about 2020 through at least in or about 2022, KuCoin was used to launder the proceeds of a wire fraud and bank fraud scheme that operated for over two years and in which millions of dollars were stolen from U.S. banks and other cryptocurrency exchanges.  And between or about August 8, 2022, and in or about November 2023, almost 197 KuCoin deposit addresses directly or indirectly received a total of more than $3.2 million worth of cryptocurrency from Tornado Cash, a virtual currency mixer that was designated by the Office of Foreign Assets Control as a Specially Designated National ("SDN") on August 8, 2022 because it was used to launder the proceeds of cybercrimes.  This SDN designation prohibited U.S. persons or persons within the United States from transacting with Tornado Cash.

49.    From in or about September 2017 to the present, KuCoin failed to file any reports of suspicious transactions to the Department of the Treasury as required by 31 U.S.C. § 5318(g) and 31 C.F.R. §§ 1026.320 and 1022.320.

## STATUTORY ALLEGATIONS

50.    The allegations contained in paragraphs 1 through 49 of this Indictment are repeated and realleged as if set forth fully herein.

51.    From at least in or about July 2019 through the present, in the Southern District of New York and elsewhere, FLASHDOT LIMITED, formerly known as Phoenixfin Limited, PEKEN GLOBAL LIMITED, PHOENIXFIN PRIVATE LIMITED, CHUN GAN, a/k/a "Michael," and KE TANG, a/k/a "Eric," the defendants, willfully and knowingly combined,

conspired, confederated, and agreed together and with each other to commit an offense against the United States, to wit, violations of the Bank Secrecy Act, in violation of 31 U.S.C. §§ 5318 and 5322, and 31 C.F.R. §§ 1026.210, 1026.220, 1026.300, and 1026.320.

52.     It was a part and object of the conspiracy that FLASHDOT LIMITED, formerly known as Phoenixfin Limited, PEKEN GLOBAL LIMITED, PHOENIXFIN PRIVATE LIMITED, CHUN GAN, a/k/a "Michael," and KE TANG, a/k/a "Eric," the defendants, and others known and unknown, would and did willfully cause a financial institution to violate the Bank Secrecy Act by failing to establish, implement, and maintain an anti-money laundering program that satisfies the minimum standards required by 31 U.S.C. §§ 5318 and 5322, and 31 C.F.R. §§ 1026.210 and 1026.220, and by failing to abide by the reporting requirements of 31 U.S.C. §§ 5318 and 5322, and 31 C.F.R. §§ 1026.300 and 1026.320, to wit, the defendants caused KuCoin, a futures commission merchant with U.S. customers, to fail to establish and implement an anti-money laundering program that included policies, procedures, and internal controls reasonably designed to prevent KuCoin from being used for money laundering or terrorist financing; or risk-based procedures for verifying the identity of each KuCoin customer to the extent reasonable and practicable; and further caused KuCoin to fail to file any Suspicious Activity Reports with FinCEN.

## Overt Acts

53.     In furtherance of the conspiracy, and to effect the illegal object thereof, FLASHDOT LIMITED, formerly known as Phoenixfin Limited, PEKEN GLOBAL LIMITED, PHOENIXFIN PRIVATE LIMITED, CHUN GAN, a/k/a "Michael," and KE TANG, a/k/a "Eric," the defendants, together with others known and unknown, committed the following overt acts, in the Southern District of New York and elsewhere:

18

a.  From at least in or about September 2017 through the present, the defendants caused KuCoin to transmit and accept funds, and value that substitutes for currency, in the form of Bitcoin and other cryptocurrencies, on behalf of customers who resided in the United States while using KuCoin's spot trading services.

b.  From at least in or about October 2018 through at least in or about March 2022, the domain kucoin.com was registered by TANG on behalf of PHOENIXFIN PRIVATE LIMITED.

c.  In or about January 2018, GAN opened an account with a third-party customer service software provider on behalf of KuCoin, and the third party's software and services were thereafter used to provide KuCoin customer service to U.S. customers.

d.  In or about May 2018, when a sales representative from a financial services company asked GAN to "provide your FinCEN registration as a money transmitter given your company services US citizens," GAN responded, "[w]e haven't [sic] a FinCEN registration yet."

e.  In or about January 2019, GAN received an automated email from no-reply@kucoin.com confirming that, according to his IP address, he had personally logged in to KuCoin from San Mateo, California.

f.  From at least in or about July 2019 through the present, the defendants caused KuCoin to allow customers who resided in the United States to anonymously obtain or maintain access to KuCoin, and to use KuCoin's derivative and margin trading services.

g.  In or about January 2021, TANG received an email from no-reply@kucoin.com confirming that, according to his IP address, he had personally logged in to KuCoin from Los Angeles, California.

h.  In or about February 2022, TANG participated in a meeting with representatives of Investor-2 regarding KuCoin's operations.

19

i.   In or about November 2022, the defendants allowed a customer located in New York, New York, who was using a computer associated with a U.S. IP address, to anonymously create a KuCoin account that provided access to KuCoin's spot, derivative, and margin trading services.

j.   In or about June 2022, the defendants sent KuCoin employees to a cryptocurrency conference being held in New York, New York for the purpose of, among other things, attracting U.S. customers.

(Title 18, United States Code, Section 371.)

## COUNT TWO
### (Conspiracy to Operate an Unlicensed Money Transmitting Business)

The Grand Jury further charges:

54.   The allegations contained in paragraphs 1 through 49 of this Indictment are repeated and realleged as if set forth fully herein.

55.   From at least in or about September 2017 through at least in or about December 2023, in the Southern District of New York and elsewhere, FLASHDOT LIMITED, formerly known as Phoenixfin Limited, PEKEN GLOBAL LIMITED, PHOENIXFIN PRIVATE LIMITED, CHUN GAN, a/k/a "Michael," and KE TANG, a/k/a "Eric," the defendants, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit an offense against the United States, to wit, operation of an unlicensed money transmitting business, in violation of 18 U.S.C. § 1960.

56.   It was a part and object of the conspiracy that FLASHDOT LIMITED, formerly known as Phoenixfin Limited, PEKEN GLOBAL LIMITED, PHOENIXFIN PRIVATE LIMITED, CHUN GAN, a/k/a "Michael," and KE TANG, a/k/a "Eric," the defendants, would and did knowingly conduct, control, manage, supervise, direct, and own all and part of an unlicensed

20

money transmitting business, which affected interstate or foreign commerce and failed to comply with the money transmitting business registration requirements under 31 U.S.C. § 5330, and regulations prescribed under such section, in violation of 18 U.S.C. § 1960, to wit, the defendants caused KuCoin, a cryptocurrency exchange, to accept and transmit funds and value that substitutes for currency, in the form of Bitcoin and other cryptocurrencies, on behalf of U.S. customers, without registering with FinCEN.

## Overt Acts

57.     In furtherance of the conspiracy, and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.     The overt acts contained in paragraphs 53.a through 53.j of this Indictment are repeated and realleged as if set forth fully herein.

(Title 18, United States Code, Section 371.)

## COUNT THREE
### (Violation of the Bank Secrecy Act)

The Grand Jury further charges:

58.     The allegations contained in paragraphs 1 through 49 and 53 of this Indictment are repeated and realleged as if set forth fully herein.

59.     From at least in or about July 2019 through the present, in the Southern District of New York and elsewhere, FLASHDOT LIMITED, formerly known as Phoenixfin Limited, PEKEN GLOBAL LIMITED, and PHOENIXFIN PRIVATE LIMITED, the defendants, did willfully cause a financial institution to violate the Bank Secrecy Act by failing to establish, implement, and maintain an anti-money laundering program that satisfies the minimum standards required by 31 U.S.C. §§ 5318 and 5322, and 31 C.F.R. §§ 1026.210 and 1026.220, to wit, the

21

defendants caused KuCoin, a futures commission merchant with U.S. customers, to fail to establish and implement an anti-money laundering program that included policies, procedures, and internal controls reasonably designed to prevent KuCoin from being used for money laundering or terrorist financing, or risk-based procedures for verifying the identity of each KuCoin customer to the extent reasonable and practicable, as part of a pattern of any illegal activity involving more than $100,000 in a 12-month period.

(Title 31, United States Code, Sections 5318(h)(1) and (l), 5322(b) and (c); Title 31, Code of Federal Regulations, Sections 1026.210 and 1026.220; and Title 18, United States Code, Section 2.)

## COUNT FOUR
### (Operation of an Unlicensed Money Transmitting Business)

The Grand Jury further charges:

60.     The allegations contained in paragraphs 1 through 49, 53, and 57 of this Indictment are repeated and realleged as if set forth fully herein.

61.     From at least in or about September 2017 through at least in or about December 2023, in the Southern District of New York and elsewhere, FLASHDOT LIMITED, formerly known as Phoenixfin Limited, PEKEN GLOBAL LIMITED, and PHOENIXFIN PRIVATE LIMITED, the defendants, knowingly conducted, controlled, managed, supervised, directed, and owned all and part of an unlicensed money transmitting business, which affected interstate and foreign commerce and failed to comply with the money transmitting business registration requirements under 31 U.S.C. § 5330, and regulations prescribed under such section, to wit, the defendants caused KuCoin, a cryptocurrency exchange, to accept and transmit funds and value that substitutes for currency, in the form of Bitcoin and other cryptocurrencies, on behalf of U.S. customers without registering with FinCEN.

(Title 18, United States Code, Sections 1960 and 2.)

22

## FORFEITURE ALLEGATIONS

62.     As a result of committing the offense alleged in Count Two of this Indictment, FLASHDOT LIMITED, formerly known as Phoenixfin Limited, PEKEN GLOBAL LIMITED, PHOENIXFIN PRIVATE LIMITED, CHUN GAN, a/k/a "Michael," and KE TANG, a/k/a "Eric," the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any and all property, real and personal, involved in said offense, or any property traceable to such property, including but not limited to a sum of money in United States currency representing the amount of property involved in said offense.

63.     As a result of committing the offense alleged in Count Four of this Indictment, FLASHDOT LIMITED, formerly known as Phoenixfin Limited, PEKEN GLOBAL LIMITED, and PHOENIXFIN PRIVATE LIMITED, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any and all property, real and personal, involved in said offense, or any property traceable to such property, including but not limited to a sum of money in United States currency representing the amount of property involved in said offense.

**Substitute Assets Provision**

64.    If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

     a.   cannot be located upon the exercise of due diligence;

     b.   has been transferred or sold to, or deposited with, a third person;

     c.   has been placed beyond the jurisdiction of the Court;

     d.   has been substantially diminished in value; or

     e.   has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendants up to the value of the above forfeitable property.

(Title 18, United States Code, Section 982;
Title 21, United States Code, Section 853; and
Title 28, United States Code, Section 2461.)

FOREPERSON

DAMIAN WILLIAMS
United States Attorney

24